Mrs. Ursula Basile claims that as she drank from a bottle of "Jumbo" a portion of *Page 735 
its contents, she was made violently ill because it contained deleterious foreign matter which she says was some kind of oil; that at the time she was in an advanced state of pregnancy, and that because of this she had grave apprehension for 36 to 48 hours "together with much mental worry as to probable miscarriage and/or premature delivery of her unborn child."
She alleges that she had obtained the bottle of Jumbo from a dealer in fruit, vegetables and cold drinks located at 4201 Magazine Street, and that the said dealer had obtained it from defendant corporation, World Bottling Company, Ltd. She charges that the foreign matter found its place in the said bottle as a result of negligence on the part of the said defendant corporation, and she prays for judgment for $750 to compensate her for her pain, suffering and mental anguish.
Defendant corporation conceded that it had sold the bottle to the dealer from whom plaintiff obtained it but it denied that it contained any deleterious foreign matter, and denied that she had sustained any injury or illness as a result of drinking any part of the contents. It also averred that the plant in which it conducts its business "contains modern and up-to-date machinery and equipment and that it exercises the highest degree of care in washing its bottles, in making the beverage and examining the finished product in the bottles before same leaves its plant; that it subjects the finished product in the capped bottles to what is known as the light test for the purpose of discovering foreign matter in the beverages which it manufactures; that the equipment, process and tests used by it are those which are in use by the most modern and approved bottling establishments."
In the district court there was judgment in favor of plaintiff for $300 and defendant has appealed.
The record shows that plaintiff is the daughter of the operator of the establishment at which she obtained the bottle of Jumbo, or "Gimme", which is the trade name under which defendant at that time sold one of its products, and that she lives in the residential portion of the building and assists in the conducting of the fruit, vegetable and cold drink business operated by her mother.
Under these circumstances, it becomes more than usually important that plaintiff prove with acceptable certainty the facts on which she bases her claim for we have many times said in cases of this kind that "* * * it is well to bear in mind that the manufacturer necessarily can have no means of disproving by eyewitnesses that the occurrence alleged actually took place. * * *"
We added that: "* * * In such circumstances, plaintiff's evidence should be most carefully scrutinized, especially when, as here, the evidence of defendant shows that because of the extreme care employed in the course of manufacture and in the course of bottling, it is, though not impossible, highly improbable that a foreign substance could have entered into the article." Russo v. Louisiana Coca-Cola Bottling Co., La.App., 161 So. 909, 910.
See also Hill v. Louisiana Coca-Cola Bottling Co., La.App., 170 So. 45; Freeman v. Louisiana Coca-Cola Bottling Co., La.App., 179 So. 621; Kohlman, et al. v. Jefferson Bottling Co., Inc., La.App., 192 So. 113; Comforto et ux. v. Cloverland Dairy Products Co., Inc., La.App., 194 So. 43.
We repeat that in this case where the product was obtained by the consumer from what is practically her own establishment and is consumed by her in that establishment, it is particularly necessary that the facts be proven to the complete satisfaction of the court.
And when we view the facts as presented by the record before us we cannot avoid the conclusion that those facts have not been so proven. In the first place, plaintiff complains that the bottle contained oil of some kind, either kerosene or linseed oil, or some such substance, all of which substances mentioned by her have a very pungent odor and a very marked taste, and yet she says that she "grabbed a bottle of Jumbo and drank it down so quick that I didn't realize it didn't taste exactly right."
A little bit later she contradicts the statement that she grabbed the bottle and drank it down quickly when she says that the reason she took the drink was that her sister, who was visiting her, asked for a drink and that she, plaintiff, poured her own drink into a glass and drank it. Common politeness would have dictated that, since plaintiff was serving her sister a drink as well as herself, she give the first drink to her sister.
Another interesting fact is that in order to avoid the suggestion that the attack of nausea from which she says she suffered as *Page 736 
a result of drinking the liquid was caused by her pregnancy, she said that at no time during that or during her previous pregnancy had she ever been nauseated. She made this statement very positively, and when asked if she had suffered from nausea either during pregnancy with this child or "ever in your life" she answered "No sir." And counsel for defendant, in order to avoid any possibility of misunderstanding said to her: "I ask you to recall from your recollection and state if at any time in your life you have been nauseated" and she answered "No sir".
Another statement made by her which we find difficulty in believing is that at no time had she left the shop between the time at which the bottles had been delivered from the truck on the day before until she was made ill on the Sunday morning on which she drank. It is hard to believe that she remained in that shop all of the day on which the drinks had been delivered, never leaving it at all and all of the morning on which she drank from the bottle.
But most damaging of all to her case is the total failure of her doctor to confirm her statement that she was made ill by drinking the liquid out of the bottle on the morning on which she claims that she was so violently nauseated. Dr. Salerno who treated her during her pregnancy and had treated her during her previous pregnancy, stated that he had no recollection whatever of having been called to see her because of nausea on that occasion. He said that it might be possible that his records would show that he had made such a visit and he was asked to examine his records and report back and testify whether he had ever made a visit as a result of being called because of nausea, but no effort was made later to again put Dr. Salerno on the stand to testify from his records, although when the testimony was finally closed on July 1st, 1943, the record shows that the hearing was continued until the next day to secure that testimony.
It is possible that there was something in the shop which spilled upon the bottle on the outside and gave it some sort of odor of oil and there are statements in the record to the effect that when the bottle was produced in court there were marks on it which might have been made by paint or some kind of oil or other liquid.
During the trial, counsel for defendant stated that he was so certain that there was nothing harmful in the bottle that he asked the court's permission to drink from it and the record shows that he drank a glass of the liquid from the bottle and later called attention to the fact that he had suffered no harmful effects whatsoever.
We think it unnecessary to say more. The record falls far short of convincing us that the plaintiff drank any deleterious substance or that she sustained any harmful effects from drinking from the bottle.
The judgment appealed from is reversed and plaintiff's suit is dismissed at her cost.
Reversed.